CORNELIUS EMERSON *v.* STATE OF INDIANA.

[No. 2-1274A300. Filed May 26, 1976.]

*William Levy*, of Indianapolis, for appellant.

*Theodore L. Sendak*, Attorney General, *Robert F. Colker*, Assistant Attorney General, for appellee.

GARRARD, J.—Emerson filed a petition for post conviction relief alleging reversible error in the refusal of the trial court to permit him to withdraw a guilty plea which had been entered May 16, 1974. Relief was denied and Emerson appeals.

When Emerson entered his plea of guilty to a reduced charge of robbery, IC 1971, 35-4.1-1-6 (c) providing for the withdrawal of such pleas after judgment and sentence, was in effect. The statute, which is set out below, provides that after judgment and sentence, a plea may not be withdrawn as a matter of right. Withdrawal, however, shall be permitted if the accused establishes that withdrawal of the plea is necessary to correct manifest injustice.[1]

---

1. "(c) After judgment and sentence upon a plea of guilty, the convicted person may not as a matter of right withdraw such plea. Provided, however, upon motion of the convicted person the court shall vacate the judgment and allow the withdrawal whenever the convicted person proves that withdrawal is necessary to correct a manifest injustice. A motion to vacate judgment and withdraw the plea made pursuant to this subsection shall be treated by the court as a petition for post-conviction relief pursuant to the post-conviction remedies rules of the Indiana Supreme Court and the provisions of such rules shall govern the procedure upon such petition except as expressly otherwise provided herein. For purposes of this subsection, withdrawal of the plea of guilty is necessary to correct a manifest injustice whenever:

    (1) the convicted person was denied the effective assistance of counsel;
    (2) the plea was not entered or ratified by the convicted person;
    (3) the plea was not knowingly and voluntarily made;
    (4) the prosecuting attorney failed to abide by the terms of a plea agreement;

The only ground asserted by Emerson to secure vacation of his plea is that the plea was not knowingly and voluntarily entered because he thought he would be sentenced under the provisions of the minors sentencing act, IC 1971, 35-8-3-1.

In *Dube* v. *State* (1971), 257 Ind. 398, 275 N.E.2d 7, and again in *Watson* v. *State* (1973), 261 Ind. 97, 300 N.E. 354, our Supreme Court recognized that the failure of the trial court to adequately advise an accused at arraignment regarding the consequences of a plea bargain would deprive the plea of the knowing and voluntary character necessary to sustain it.

Both decisions, however, expressly recognize that the trial judge is not, and should not be, bound by recommendations made by law enforcement officers. Furthermore, it is the statutory policy of our state to provide for sentencing in felony cases only after a pre-sentence investigation has been conducted and the information thus secured has been reviewed by the court. See, IC 1971, 35-8-1A-9 (Burns Code Ed.) That report might disclose factors thitherto unknown by all but the accused and which might bear great significance upon proper disposition of the case.[2]

Thus, the question presented by Emerson's appeal is whether the facts and circumstances surrounding his plea demonstrate that it was not knowingly and voluntarily entered into so as to have made it obligatory for the trial court to have vacated the plea to correct manifest injustice.[3] In considering this question, it must be

(5) the plea and judgment of conviction thereon are void or voidable for any other reason.

The motion to vacate the judgment and withdraw the plea need not allege, and it need not be proven, that the convicted person is innocent of the crime charged or that he has a valid defense."

2. Thus, in view of the formal recognition of plea bargains now afforded by statute, IC 1971, 35-5-6-2 (Acts 1975) provides for securing the pre-sentence investigation when the prosecutor advises the court of the existence of a recommendation.

3. The motion was not made until after sentence had been pronounced. Where the motion is made before sentencing, the court may

borne in mind that Emerson had the burden of proof and now stands in the shoes of one appealing from a negative judgment.

In both *Dube* and *Watson* the accused was arraigned and his guilty plea was accepted without any disclosure of the existence of a plea bargain or its contents. Furthermore, it was undisputed that when the plea was tendered, the accused believed in good faith that the bargain would be honored. Under these facts, the court logically held that a necessary ingredient of voluntariness, understanding the consequences of the plea, was lacking.

The facts now before us differ substantially from those in *Dube* and *Watson*. In open court Emerson executed and tendered a written motion to withdraw his previously entered plea of not guilty and enter a plea of guilty. That motion disclosed the existence of the plea bargain and that the prosecuting attorney had agreed to recommend sentencing under the minors sentencing statute. The motion also contained the following:

> "(7) I understand that even though the prosecuting attorney may have agreed to make a recommendation as to my sentence the Court is not a party to that agreement and is not required to follow that recommendation; that the sentence imposed by the Court may be greater than, the same as, or less than the sentence recommended by the prosecutor. I understand also that if I plead GUILTY my punishment could be the same as, greater than or less than if I had pleaded NOT GUILTY, had stood trial and been convicted by a Court or Jury."

When the motion was tendered, the trial judge examined Emerson regarding his understanding of his constitutional rights and explained the charges against him. The plea bargain recommendation was disclosed and the judge explained both the statutory penalty for robbery and the choice of

allow withdrawal of the plea for any fair and just reason unless the state has been substantially prejudiced by reliance upon the plea. IC 1971, 35-4.1-1-6 (b).

penalties that might be imposed under the minors sentencing statute. He then ascertained that Emerson was under twenty-one and had not been previously convicted of a felony, and was thus eligible to be sentenced as a minor. The following colloquy then accurred:

"Q. Then you would be eligible, but that does not guarantee that you will be sentenced under the minor statute, do you understand that?

A. Yes, sir.

Q. If you were sentenced under the minor statute, I could give you up to year [sic] or one to ten years, but this is my decision and I'll base my decision upon the presentence report, upon anything you want to tell me, your attorney wants to tell me, or anybody that wants to tell me at the time of sentencing. Then I'll decide whether I give you one to ten, or one day to a year, or ten to twenty-five years, do you understand?

A. Yes, sir.

Q. Do you have any questions about anything that we have discussed or what you are doing here today?

A. No, sir.

Q. Is this what you want to do?

A. Yes, sir."

On this record we cannot say that all reasonable men must conclude that Emerson's plea was not voluntarily and knowingly entered because he was unaware that the court might not impose sentence under the minors sentencing statute.

Therefore, the decision must be affirmed.

Hoffman, J., concurs; Staton, P.J., dissents with opinion.

DISSENTING OPINION

STATON, P.J.—I dissent for these reasons:

I. Emerson's guilty plea was not voluntary. He did not have sufficient awareness of the relevant circumstances and likely consequences of his guilty plea. *See Brady* v. *United States* (1970), 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed. 2d 747. He was not aware that the trial court personally felt that the crime of robbery was too serious for

sentencing under the minor statute and that the likely. consequence of his plea of guilty was that the trial court would not accept the State's recommendation for sentencing under the minor statute.

II. Immediately after sentencing, a motion to withdraw the guilty plea was made by Emerson's defense counsel. When denying the motion to withdraw, the trial court's sole concern was directed at its legal justification in originally accepting the plea of guilty from Emerson. This was an abuse of discretion by the trial court. It should have advised Emerson that it could not consider the sentencing concession, sentencing under the minor statute, as recommended by the State. An opportunity should have been given to Emerson to either reaffirm his guilty plea to be sentenced under the robbery statute or to withdraw his plea of guilty.

III. The trial court has ignored the judicial policy of the Indiana Supreme Court which was first announced for the Court by Justice Hunter in *Dube* v. *State* (1971), 257 Ind. 398, 407, 275 N.E.2d 7, 11, and reaffirmed by Chief Justice Givan in *Watson* v. *State* (1973), 261 Ind. 97, 99, 300 N.E.2d 354; 355:

> "It is important for all segments of our society to believe that our court systems dispense justice. This includes the criminals themselves as well as the law abiding citizens, and especially those criminals who have cooperated fully in police investigations. . . ."

I would reverse with instructions to vacate the judgment and the sentence. I would further instruct the trial court to grant the motion to withdraw the plea of guilty.

## I.

### *Voluntary*

Cornelius Emerson was eighteen years old. He had dropped out of high school after completing only six credits. His I.Q. was below average. Before he pleaded guilty on May 16, 1974

to robbery with a recommendation by the State that he be sentenced under the minor statute, Emerson had cooperated fully with the police. His accomplice, Carpenter, had escaped from the police during the robbery. Carpenter was captured in April, 1974. In addition to his statement concerning Carpenter's involvement, Emerson aided the police by clearing up another robbery.

When Emerson's defense counsel entered a written guilty plea, the following colloquy occurred:[1]

### "QUESTIONS BY THE COURT:

"Q. Mr. Emerson, did you read this written notice before you signed it and filed it today?

"A. Yes, sir.

    "*Mr. Sobel:* It was read to him, Your Honor.

    "*Court:* It was read to him?

    "*Mr. Sobel:* Yes, Sir.

    "*Court:* By you?

---

1. A part of this dissent could be directed to the non-compliance of the trial court with IC (1971), 35-4.1-1-3 (c) (Burns Code Ed.); however, this dissent is based upon more fundamental principles of law rather than the more technical compliance with the statute. The statute provides:

"The court shall not accept a plea of guilty from the defendant without first addressing the defendant and

"(a) determining that he understands the nature of the charge against him;

"(b) informing him that by his plea of guilty he is admitting the truth of all facts alleged in the indictment or information or to an offense included thereunder and that upon entry of such plea the court shall proceed with judgment and sentence;

"(c) informing him that by his plea of guilty he waives his rights to a public and speedy trial by jury, to face the witnesses against him, to have compulsory process for obtaining witnesses in his favor and to require the state to prove his guilt beyond a reasonable doubt at a trial at which the defendant may not be compelled to testify against himself;

"(d) informing him of the maximum possible sentence and minimum sentence for the offense charged and of any possible increased sentence by reason of the fact of a prior conviction or convictions, and of any possibility of the imposition of consecutive sentences;

"(e) informing him that the court is not a party to any agreement which may have been made between the prosecutor and the defense and is not bound thereby."

"Q. Can you read and write?

"A. Yes, sir.

> "*Court:* Mr. Sobel, you read each and every sentence?
>
> "*Mr. Sobel:* Each and every paragraph, each and every sentence, he was incarcerated and it's difficult to take it back to him.
>
> "*Court:* Oh, I see, it was through the bars.
>
> "*Mr. Sobel:* Yes, Your Honor.

"Q. Mr. Emerson, did you understand everything your lawyer read to you?

"A. Yes, sir.

"Q. Did you understand your Constitutional rights to plead not guilty to this charge, to have a trial by Jury and to see the witnesses, the presumption of innocence, and all of those rights that he read to you?

"A. Yes, sir.

> "*Mr. Sobel:* Speak up please.

"Q. You know you have those rights?

"A. Yes, sir.

"Q. And when you enter your plea of guilty, that you are giving up those rights, do you understand that?

"A. Yes, sir.

"Q. You are offering to plead guilty to the crime of robbery as covered by the charge of armed robbery, is that right?"

[no answer from defendant due to interjection by Mr. Sobel]

Later, the trial court was advised that a plea agreement existed.

> "*Court:* What's the plea agreement Mr. Beplay?
>
> "*Mr. Beplay:* Your Honor, the State has agreed to make only the recommendation for sentencing under

the minor statute and no recommendation beyond that.

"*Court:* No recommendation as to time?

"*Mr. Beplay:* Yes, sir.

"*Court:* Is that the agreement, Mr. Sobel?

"*Mr. Sobel:* Yes, sir.

"Q. Mr. Emerson, to be eligible for sentencing under the minor statute, you have to be under the age of twenty-one, what is your age?

"A. Eighteen.

"Q. Also to be eligible, you cannot have been convicted of a felony before, have you been convicted of a felony before?

"A. No, sir.

"Q. Then you would be eligible, but that does not guarantee that you will be sentenced under the minor statute, do you undertand that?

"A. Yes, sir.

"Q. If you were sentenced under the minor statute, I could give you up to year or one to ten years, but this is my decision and I'll base my decision upon the pre-sentence report, upon anything you want to tell me, your attorney wants to tell me, or anybody that wants to tell me at the time of sentencing. Then I'll decide whether I give you one to ten, or one day to a year, or ten to twenty-five years, do you understand?

"A. Yes, sir."

These circumstances indicate that if Emerson is eligible to be sentenced under the minor statute, the presentence investigation report and what others have to say in his behalf will guide the trial court. Emerson was eligible to be sentenced under the minor statute. His defense counsel and minister spoke in his behalf. The presentence report revealed his co-operation with the police and his family background. It

pointed out that he was learning to be a bricklayer and had been gainfully employed. The probation officer recommended an executed sentence at the Indiana Youth Center. Until the time of sentencing, the trial court did not indicate that it felt the crime of robbery was too serious for sentencing under the minor statute and that Emerson's sentencing should serve as an example to others on the street who might commit a similar crime.[2] This consequence of entering a plea came suddenly and at the pronouncement of sentence. It could not have

2. The trial court was well aware that the State had accepted a reduced charge from armed robbery to robbery when it recommended sentencing under the minor statute. Additionally, the trial court was well aware of the factual basis for the plea when it accepted the guilty plea. The following statement was made later at sentencing:

"*E.T. Johnson:* You'd rather be here and going to Church every Sunday, wouldn't you son?

"*Cornelius Emerson:* Yes, sir.

"*Court:* I think I would too. Between prison and church, I'd think I'd take the church over the jail. There's one critical problem involved here. Since I've been up on the Bench, I've seen several dead innocent people killed in a robbery just like this, somebody gets greedy, takes a pistol, a man doesn't do exactly what they want, makes a wrong move, bang, he's dead. Now that person is completely innocent, and when he's dead, then the person who commits the robbery serves life in prison, even if he's not killed, but only injured, the person who commits the robbery serves life in prison. The only difference between life in prison for Cornelius Emerson and what I'm likely to give him is the fact that there was nobody injured or killed in this robbery. Reverend, I think you understand how dangerous it is when people go around with guns. . . ."

\* \* \*

"*Court:* No, Cornelius didn't hold the gun, Cornelius merely recovered the money.

"*Mr. Sobel:* He recovered the money.

"*Court:* He was the collector, the other man held the gun, Cornelius collected the money.

"*Mr. Sobel:* I don't think Cornelius realized he had drawn the, or what he was doing there.

"*Court:* No, he probably didn't. Unfortunately too many of the folks out there in the streets don't realize how serious the behavior they are engaging in is, and I'd like to get that point across to the young people who think that armed robbery is a lark. I'm sure Cornelius Emerson's family is a very nice family, and I'm sure you do try to be and I'm certain that you've led a good life. And the Reverend of course has led a good life, and you've tried to do the best you can with the folks in your flock. But sometimes there are people over which you have no control. All you can do is advise, you can give them the benefit of your experience and your wisdom, but if the person wants to go his own way, that's his decision, right?"

been anticipated by Emerson or his defense counsel. Being unaware of these subjective circumstances and their consequences upon his guilty plea, Emerson entered an involuntary plea of guilty.

## II.

### Abuse of Discretion

Immediately after sentencing, Emerson's defense counsel moved to withdraw the plea of guilty. This motion was denied. In its denial of the motion, the trial court's sole concern was its legal justification for accepting the guilty plea: Emerson had been told that the trial court was not bound by the plea agreement with the State. This legal justification has deep roots in Anglo-Saxon jurisprudence. Its rationale is that to bargain or to be a party to plea negotiations is beneath the sovereign's dignity; therefore, to avoid compromising the sovereign's position in plea agreements, the English trial courts considered plea negotiations to be conducted strictly between the parties. When the plea of guilty was entered, it could not be withdrawn. See R. CHERRY, LECTURES ON THE GROWTH OF CRIMINAL LAW IN ANCIENT COMMUNITIES 8 (1890) ; 2 F. POLLOCK & F. MAITLAND, THE HISTORY OF ENGLISH LAW 450-51 (2d ed. 1968) ; J. JEUDWINE, TORT, CRIME, AND POLICE IN MEDIEVAL BRITIAN 87 (1917) ; Beccaria, *On Crimes and Punishments in* GREAT IDEAS TODAY 353 (1974). Such medieval rationale can hardly reflect the fairness and equity standards adopted by American courts in the twentieth century.

Our Indiana Supreme Court has held that legal justification in accepting a guilty plea should not be the trial court's sole concern in denying a motion to withdraw the plea. In *Allman* v. *State* (1968), 233 Ind. 14, 24, 235 N.E.2d 56, 62, Justice Hunter, writing for the court, stated ". . . . in instances where a timely motion to withdraw the plea has been filed, the trial court's concern should not be directed solely

to the question of the court's own legal justification in originally accepting the plea of guilty. . . ."

No inquiry was made by the trial court regarding the advice of counsel to Emerson on the sentencing concession. Yet, the record discloses that Emerson's defense counsel pressed hard for probation and disagreed with the recommendation of the probation officer which had been made in the presentencing report.[3] Further, a colloquy between Emerson's defense counsel and the trial court casts a long shadow upon Emerson's understanding as to what sentence he would receive at the hands of the trial court:[4]

---

3. "*Court:* Would you like to make a statement in behalf of your client before I pronounce. . . .
"*Mr. Sobel:* Yes, Your Honor, I most definitely have. I read the Probation Officer's report, and I beg to differ with him in his conclusions in this particular matter. He's looking at this thing simply from interviewing one out of probably thousands of young men. I'm looking at this young man whom I've known since January, and I've seen at least a half a dozen times down at the jail and spoke to him. This is a young man that was one of the poor, his education at best is limited, his intellectual ability is again grossly limited, his parents are very concerned about him, and I think they've taken care of him as best they can, I don't think there's anything that could be said that there was a lack of parental discipline, you will note from the report, the young man worked, he wasn't any bum, he went to school and he worked while he was in school, he worked when he got out of school. He's never been in Juvenile Court, he's never [been] arrested or charged with anything, he ran into a young man who overruled him, made him feel that a life of poverty, that as he knew it, could be beaten, he sort of intimidated into going wrong, he's learned his lesson severely, he's been in jail for six months, I don't see where any incarceration whatsoever is going to be to this young man's benefit. He's ready to go back to work, there's work waiting for him, as I understand the Indiana law, the object is rehabilitation, and I think from the Probation Officer's report, we've got something that's more punitive than anything else. If he wants to have some type of supervision on this young man, I think probation, a suspended sentence and probation, maybe a severe probation, would help him get into a job, some type of training, he's learned to be a brick layer, it would be more to this young man's advantage than to a disadvantage, he's quite contrite about what happened, he's been free and open with his statements, he's not trying to conceal anything, he even tried to straighten out the record as to the so-called other robbery took place, he realizes he's been wrong, and this is his Reverend, I believe, is here, and would like to speak in his behalf also, Your Honor, if the Court would give me an opportunity to present evidence."
4. The rationale presented in this dissent should not be confused with the expectation of a lesser sentence rationale. In the expectation of a lesser sentence, there exists a possibility of a lesser sentence although it is not forthcoming at sentencing. No possibility for sentencing under the

*"Mr. Sobel:* I believe that he's not a violent type young fellow, there is no antagonism, there's no bitterness, he's, I believe that justice would be no better served here, he has been in jail for six months, if he would have some sort of probation and suspended time, I've been in your, in this Court before, I've been before you before, you've given people opportunities, if they even comply with their probation, a second chance, I think this young fellow, from what I know of him, what I know of my experience with various criminals, he deserves at least a first chance.

*"Court:* Mr. Sobel, you are absolutely right, I believe firmly in probation, in attempting to rehabilitate a person outside of prison, with just a few exceptions, and this is one of them. As a matter of policy, there are crimes that are very serious, this is much more serious than a man who shoots his arm full of heroin, much, much more serious. This is a threat to society, not just to Cornelius Emerson, this is a threat to innocent people who go in that drugstore, run a drugstore, I mean even customers who've been murdered in drugtores because they don't do what the robbers think they should do. And this is something that we cannot take lightly, and maybe has been taken lightly, there are too many armed robbers that have the understanding that I get a free one, so they, they figure well I'll keep committing robberies until I get caught because nothing is going to happen to me the first time anyway.

*"Mr. Sobel:* Judge, I don't think he has that understanding, what I brought up about the drug problem was that many of these young men commit these things, these drug relating crimes, they are desperate, whether their reasoning is clouded by narcotics some way or another, what I'm trying

---

minor statute existed when the guilty plea was accepted by the trial court in Emerson's proceedings. A careful reading of the record discloses that the trial court considered the crime too serious for sentencing under the minor statute from the inception of the sentencing proceedings. No other reason was given by the trial court for refusing to follow the state's recommendation.

to bring out is that this guy doesn't have that problem and he's not going to have any trouble bothering him if he is on the street to force him to feel that he's got to do something to relieve the addiction, because inside their body . . . ."

Mr. Sobel, Emerson's defense counsel, had advised the trial court: "Judge, I don't think that he has that understanding. . . ." In the presence of Emerson, the State, and the trial court, Mr. Sobel had urged probation for Emerson. He zealously disagreed with the recommendation in the pre-sentencing report which recommended that Emerson serve an executed sentence at the Youth Center. He reminded the trial court that on prior occasions the trial court had followed the practice of giving defendants a chance to rehabilitate themselves. He emphasized the lack of any drug addiction. He represented to the trial court that Emerson had never been convicted of a felony and that "he's never been in Juvenile Court, he's never [been] arrested or charged with anything . . . ."

Mr. Sobel's statements clearly indicate that Emerson's understanding was not that he would receive a sentence of ten to twenty-five years for entering a plea of guilty; on the contrary, these statements cast a shadow upon Emerson's understanding of his guilty plea and indicate that Emerson may have been given some hope of probation by his defense counsel. Certainly, Emerson understood that there was a possibility that he might be sentenced under the minor statute. Yet, no inquiry was made by the trial court. Failure to make any inquiry was an abuse of discretion. *Dube* v. *State, supra.*

## III

### *Judicial Policy*

The trial court has completely ignored the judicial policy of the Indiana Supreme Court. This policy was first enunciated for the Indiana Supreme Court by Justice Hunter in

*Dube* v. *State, supra,* and reaffirmed by Chief Justice Givan in *Watson* v. *State, supra,* 261 Ind. at 99, 300 N.E.2d at 355:

" 'It is important for all segments of our society to believe that our court systems dispense justice. This includes the criminals themselves as well as the law abiding citizens and especially those criminals who have cooperated fully in police investigations.' "

Emerson was a criminal who had cooperated fully with police investigations.

This policy is reflected in the Commentary to Section 3.3 (b) of the American Bar Association Proposed Revisions of the Standards Relating to Pleas of Guilty.[5] Federal Rules of Criminal Procedure, Rule 11 (e) (4) provides:

---

5. The Commentary to Section 3.3 (b) of the Proposed Revisions to the Standards Relating to Pleas of Guilty states:

"Under the proposed change to section 3.3 (b), if the trial judge later changes his mind, he must inform the defendant of this fact and provide the defendant with an opportunity to withdraw his plea. The basis for the proposed change is that even though the prior concurrence of the trial judge was conditional, so that strictly speaking his later decision on final disposition is not contradictory, it nonetheless seems fair to give the defendant an opportunity to withdraw his plea. If the judge were not to give the defendant this chance, but instead held the defendant to his plea and refused to grant the concessions contemplated in the plea agreement, the defendant would probably believe that he had been dealt with unfairly. There are obvious reasons, from a correctional standpoint, why a defendant should be satisfied that he was treated fairly when he arrives at the pentientiary. It should be noted that such a situation will only arise when the judge chooses to give advance notice as to his concurrence in the agreement. When he does so, it is believed that the occasions in which he finds need to change his mind will be exceedingly rare.

"Under the proposed change, the judge may indicate precisely in what respect he now does not concur in the plea agreement (*e.g.,* 'the agreement contemplated from one to three years, but I have now concluded that I would impose from two to four years'), but he is under no obligation to do so. Rather, he need only advise the defendant that he no longer concurs in the disposition contemplated by the plea agreement and then inquire whether the defendant wishes to affirm or withdraw his prior plea. As with the original entry of the plea (see § 1.1), the defendant's response should be received from the defendant himself in open court, except when the defendant is a corporation. A verbatim record of the court's advice to the defendant and the defendant's response should be made and preserved in the same fashion as for the original receipt of the plea (see § 1.7).

"All of the Commentary to section 3.3 in the original report (ABA STANDARDS, PLEAS OF GUILTY [Tent. Draft, Feb. 1967]) would still be relevant under the proposed change, except for the paragraph on page 76 immediately preceding the heading 'Section 3.3 (c).' "

"If the court rejects the plea agreement, the court shall, on the record, inform the parties of this fact, advise the de-defendant personally in open court or, on a showing of good cause, in camera, that the court is not bound by the plea agreement. afford the defendant the opportunity to then withdraw his plea, and advise the defendant that if he persists in his guilty plea or plea of nolo contendere the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement."[6]

Emerson should have been advised before sentencing that the trial court for some reason no longer concurred in the sentencing concession recommended by the State, sentencing under the minor statute, and that he could either reaffirm his plea of guilty or withdraw his guilty plea. This would have been the fair procedure contemplated by the judicial policy of the Indiana Supreme Court and the A.B.A. Standard. The trial court committed a further abuse of discretion when it ignored the judicial policy of the Indiana Supreme Court. It failed to make me believe that justice was dispensed.

I would reverse with instructions to vacate the judgment and sentence. I would further instruct the trial court to grant the motion to withdraw the plea of guilty.

NOTE.—Reported at 348 N.E.2d 48.

---

6. Although there is no formal Indiana Supreme Court Criminal Rule similar to the Federal Criminal Rule 11(e)(4), we note that the Indiana Supreme Court's policy is further reflected by IC 1971, 35-5-6-2 (Burns Code Ed. 1975 Supp.) which requires the trial court to advise the defendant whether it will accept the State's sentencing recommendation. This statute, which was passed in 1975, provides:

"(a)   No recommendation may be made by the prosecutor to a court on a felony charge except (1) in writing, and (2) before the defendant enters a plea of giulty. The recommendation shall be shown as filed, and, if its contents indicate that the prosecutor anticipates that the defendant intends to enter a plea of guilty to a felony charge, the court shall order the presentence report required by IC 1971, 35-4.1-4-9 and may hear evidence on the recommendation.

"(b)   Neither the content of the recommendation, the presentence report nor the hearing shall be a part of the official record of the case unless the court approves the recommendation. If the recommendation is not accepted, the court shall reject the same before the case may be tried. If the court rejects the recommendation, subsquent recommendations may be filed with the court, subject to the same requirements this chapter [35-5-6-1—35-5-6-3] imposes upon the initial recommendation. If the court accepts a recommendation, it shall be bound by its terms."